IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO.   19-cr-00437-WJM

UNITED STATES OF AMERICA,

        Plaintiff,

v.

MARK URIBES,

        Defendant.

___

**MOTION FOR NON-GUIDELINE SENTENCE**
___

    During a week-long period in January of 2018, Mark Uribes sold cocaine and methamphetamine in two transactions to an undercover agent in Adams County, Colorado. Twenty-two months later, in October 2019, he was indicted for two counts of possession with intent to distribute controlled substances, both violations of 21 U.S.C. §841(a)(1). Docs. 1. On October 15, 2019, he was arrested pursuant to that indictment, then released on bond seven days later. Docs. 3, 11. He entered a plea of guilty to one count of the indictment in August 2020 and was allowed to remain on bond. Doc. 26. He is now set for a sentencing hearing on February 17, 2021, more than three years after the commission of the offense.

    For his crime, Mr. Uribes will be seeking a term of 51 months' imprisonment, with a recommendation to the Bureau of Prisons' Residential Drug Abuse Program (RDAP), followed by three years of supervised release. This sentence is below that advised by the United States Sentencing Guidelines, but is appropriate when considering Mr. Uribes' growth since he was involved in this conduct three years ago, as well as his demonstrated

successes while under supervision. Finally, this Court should consider the draconian nature of the Sentencing Guidelines' treatment of methamphetamine based on purity and sentence below that incredibly harsh guideline range. All of these factors support a sentence of 51 months' imprisonment.

**I.  Who is Mark Uribes?**

   *a. Personal History*

Mark Uribes was born in 1986 to Javier Pinon and Linda Uribes (then, just 18 years old) in Denver, Colorado. His father was in the United States illegally and returned to Mexico when Mark was six years old, leaving his 24-year-old mother to provide for the family. Mark had severe health issues as a child, following a diagnosis of Craniosynostosis, a condition in which the bones of the skull fuse together, resulting in seizures. Despite these difficulties, his mother worked diligently to provide for the family, their family ultimately grew to include seven other siblings. The family was poor, but close, living with their material grandmother. Due to his medical conditions, Mark never participated in athletic activities; he dropped out of high school in the eleventh grade to work to support his family.

When he was 22, Mark met Yvonne Torres. Ms. Torres was the mother of two children from a previous relationship and Mark immediately treated them as his own. When he was 24, Yvonne gave birth to their son, Armani Uribes. Ms. Torres and Mr. Uribes have now been together for nearly eleven years, and have had two additional children for a total brood of five.

### b. Prior Conviction and Circumstances of this offense

In June 2012, when his son Armani was one week old, Mr. Uribes was arrested on federal charges alleging possession of a short-barreled shotgun after selling two guns to an undercover agent (*see* District of Colorado case 12cr00241-PAB). For that offense- Mr. Uribes' first felony conviction- Judge Phillip Brimmer sentenced him to twelve months and one day of imprisonment and three years of supervised release. *Id.* at Doc. 37.

Mr. Uribes was released from prison on December 31, 2013, determined to never return. That determination paid off; he successfully completed his three years of supervised release with no violations, maintaining steady employment and suffering no positive urinalyses. By all indicators, Mr. Uribes was putting the criminal part of his life behind him.

But in early 2018, no longer confined within the structure of supervised release, Mr. Uribes let the stressors of daily life cloud his decisions. He and Yvonne then had four children at home, the youngest two only ten months apart, with no ability to pay for childcare. Yvonne stayed at home with the children while Mark worked, but the stressors of feeding and housing a family of six became overwhelming. He began using cocaine and marijuana to cope. In January 2018, he sold approximately two ounces of cocaine to an undercover agent; a week later, he took that agent to the house of an acquaintance, where he acted as the middleman as the agent purchased eight ounces of methamphetamine. During the transaction, Mr. Uribes noted that he typically did not sell methamphetamine but would make an exception due to his 'trust' in the undercover agent and his own financial need. Mr. Uribes also bragged about having access to guns, but there is no evidence of firearms involved in this transaction or that Mr. Uribes actually had

3

this access. The agents did not arrest Mr. Uribes after these transactions nor is there known record of additional contact between the agents and Mr. Uribes in the nearly two years before his arrest.

### c. Three years later, Mr. Uribes is a different person.

Both pre-indictment delay and the circumstances of the COVID-19 pandemic have provided an opportunity for Mr. Uribes to continue to live and work in the Denver community since the conduct that brought him before this Court. He has not squandered that opportunity, using this time to work in gainful employment and support his wife and five children. After his last conviction, he studied to become a residential and commercial electrician and joined a local union. In January 2019, a year after the conduct in this case, Mr. Uribes was working for a company installing solar panels, when he fell twenty feet from a rooftop and shattered his right ankle. Since that time, he has been involved in workman's compensation proceedings that provide him a weekly income while he recovers from this injury, one that is expected to have long-term effects on his mobility.

In August 2019, Mr. Uribes was charged with a misdemeanor count of child abuse after slapping his seven-year-old son. That case was a wake-up call to Mr. Uribes- perhaps even more than this case- because he was subject to an order of protection that separated him from his children for several months. *See* PSIR, Doc. 29 at ¶36. That charge ultimately resulted in a deferred probationary sentence of twelve months, during which time Mr. Uribes was required to complete anger management and parenting classes. *Id.* Mr. Uribes embraced this programming, completing the parenting classes within one month of sentencing and attending weekly anger management groups. *Id.* at ¶ 61. Three months after his sentencing, the order of protection was canceled and he was

4

allowed to resume residence with his family. In October 2020, after successful completion of all requirements, Mr. Uribes' guilty plea was withdrawn and deferred judgment ended successfully.

A review of his history makes clear that Mr. Uribes thrives under the structure of supervision. He has completed a three-year term of supervised release with no violations, a rigorous term of supervision following his misdemeanor conviction, and has had minimal issues on pretrial release (outside of a few urinalyses for marijuana shortly after his arrest, nearly eighteen months ago). This Court should consider these past successes not only as markers of Mr. Uribes' character, but as demonstrative of Mr. Uribes likely success under supervision in the future.

More recently, tragedy has struck Mr. Uribes' family: his youngest brother died in December 2020, at age 16. This death has been incredibly difficult for Mr. Uribes' entire family, and has only cemented Mr. Uribes' desire to dedicate his life to being a pillar of strength and support for his family.

## II. This Court should vary because the methamphetamine guidelines are flawed.

### a. *Sentencing Guidelines and this case*

The Presentence Investigation Report (Doc. 29) correctly calculates the Sentencing Guidelines that apply to this case. With respect to drugs - and methamphetamine in particular- the Guidelines use purity of the substance as an indicator of seriousness; here, the Guidelines suggest a base offense level of 32 under §2D1.1, a two-point increase under §2D1.1(a)(5), and a three-point reduction for acceptance of

responsibility.[1] With the inclusion of a two-point reduction for "safety valve," the resulting guideline is 97-121 months.

> b. *The Guidelines for Methamphetamine are flawed and this Court should vary.*

As this Court is well aware, courts are free to categorically disagree with the Guidelines' recommended sentence in any particular case, and may impose a different sentence based upon a contrary view of what is appropriate under Section 3553(a).  This includes the freedom to merely disagree with a guideline's computations and the policy decisions that are contained in the guideline*. Pepper v. United States*, 131 S. Ct. 1229, 1241 (2011); *Spears v. United States*, 129 S. Ct. 840, 843 (2009).  See also *United States v. Santillanes*, 274 F. App'x 718 (10th Cir. 2008) (reversing because the district court erroneously believed it did not have the ability to impose a below-guideline sentence based on a policy disagreement with the methamphetamine guideline).

Today's methamphetamine guidelines are not empirically-based, but rather are the product of a series of Congressional instruction that creased massive increases in the guidelines based on increased statutory penalties.  "The methamphetamine Guidelines have evolved through a series of amendments over the years, and the penalties for methamphetamine offenses have increased dramatically."  *United States v. Hayes*, 948 F.Supp.2d 1009, 1022 (N.D. Iowa 2013).

The result of years of changes increasing methamphetamine penalties is a distorted penalty structure under the Guideline's advisory ranges. Now, "[t]he Guidelines

---

[1] The current iteration of the United States Sentencing Guidelines is outdated, and does not include the expanded qualifications for a two-point "safety-valve reduction" under §5C1.2 as contemplated by 18 § 3553(f) as expanded by the 2018 First Step Act. The parties agree that Mr. Uribes has met the statutory requirements for this reduction and this Court should award an additional two-point reduction in offense level.

6

reflect a ratio of ten to one between the penalties for distribution of a mixture as compared to distribution of the pure form. U.S.S.G. § 2D1.1(c). The quantities in the Guidelines table correspond to the mandatory minimum provisions applicable to methamphetamine offenses." *Id.*

A number of District Courts - including Judge Christine Arguello, here in the District of Colorado - have found that "the Guideline ranges for offense involving actual/pure methamphetamine…. are not based on empirical data and national experience, and thus do not exemplify the Commissions exercise of its characteristic institutional role*." United States v. Pereda*, 2019 WL 463027 (D. Co. 2019) at 7. The "ice"/methamphetamine guidelines are based on purity, and purity is simply not an empirical method for determining the seriousness of a drug crime nor the appropriate sentence – particularly because it is no longer an indicator of position in a drug organization. Judge Arguello noted that "[t]he average purity of all methamphetamine in the United States is greater than 90 percent - and has been since 2011- according to the DEA." *Id.* at 10, citing U.S. Dep't of Justice, Drug Enforcement Admin., 2017 National Drug Threat Assessment 67-70 (2017). In other words, because nearly all methamphetamine in the United States is extremely pure, the purity distinction created by the guideline is not an appropriate proxy for seriousness of the offense.

Because of the distorted guidelines, methamphetamine is grossly over-punished, relative to other drugs. "The average and median length of imprisonment for methamphetamine offenders during fiscal year 2017 were 91 months and 72 months, respectively, higher than for any other drug, and a 30% higher average and a 26.32% higher median than for heroin (70 months and 57 months, respectively)." *United States*

7

*v. Nawanna,* 321 F.Supp.3d 943, 953 (N.D. Iowa May 1, 2018). In 2018, those disparities increased; the median and average sentences for methamphetamine offenders was 95 months and 77 months, 35% higher median and 38% higher average that heroin (57 and 69 months respectively). Here, had Mr. Uribes possessed the same amount of cocaine rather than methamphetamine, his base offense level would be 20 and his total guideline range would have been <u>27-33 months</u>.[2]

This comparison makes clear: a variance is appropriate here. Mr. Uribes was not a high-level dealer; he admitted that to agents that he does not normally deal in methamphetamine and did so because he needed cash. He was a father in poverty, who sold to feed his family. There is no indication that Mr. Uribes had dealers underneath him or controlled any part of the drug trade other than introducing the undercover agent to a person who had access to methamphetamine from Mexico. To be sure, that conduct warrants serious punishment. But this Court should use the methamphetamine guidelines as the starting point for considering the appropriate sentence, rather than the "ice" guideline. Using the "ice" guideline would result in a sentence that is widely disparate from others who committed the same offense with similarly serious controlled substances.

### III.    The factors of 18 U.S.C. § 3553(a) support a sentence of 51 months.

By statute, this Court is required to impose a sentence that is "sufficient, but not greater than necessary, to

> (A) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) To afford adequate deterrence to criminal conduct;

---

[2] Here, Mr. Uribes possessed 219 grams of methamphetamine and 56 grams of cocaine. PSIR at ¶ 17. Had his possessed the same amount (275 grams) of just cocaine, his base offense level would be 20, with no two-point enhancement under §2D1.1(a)(5), as that provision only implies to methamphetamine importation. With acceptance of responsibility, his total offense level would be 17; with his criminal history category of II, his guideline range would be 27-33 months.

8

>(C) To protect the public from further crimes of the defendant; and
>(D) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner…

18 U.S.C. § 3553(a).

A sentence of fifty-one months meets each of these statutory goals. This case is serious, warranting prison time, but was non-violent and was a victimless offense. Certainly, Mr. Uribes needs to learn increased respect for the law, but the requested sentence is over four times the length of his first (and only) prior felony. Deterrence from criminal conduct is directly related to correctional treatment, and will come in two different elements of this sentence: first, by drug treatment while in the Bureau of Prisons through the RDAP program, which can address Mr. Uribes' underlying substance abuse uses, and second, by intense and lengthy supervision, which has shown to be incredibly effective on keeping Mr. Uribes sober and accountable for his actions. Protection of the public is a lesser concern for this victimless crime, but Mr. Uribes has shown through treatment following his prior misdemeanor conviction that he is thoughtful and willing to address any anger issues that could arise.

## IV. Conclusion

Mr. Uribes has pleaded guilty to his offense and accepted responsibility for his conduct. This Court can look to his actions of the past three years as illustration of how Mr. Uribes has the capability and the desire to better himself beyond the conduct of this case. A sentence of 51 months' imprisonment, paired with the RDAP program and a four-year term of supervised release, is sufficient to punish him for his crimes, and will create the structure and correctional treatment necessary to ensure that he moves forward with his life as a family man and productive citizen.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender


*s/ Mary V. Butterton*
MARY V. BUTTERTON
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
Mary_butterton@fd.org
Attorney for Defendant

10

**CERTIFICATE OF SERVICE**

I hereby certify that on February 3, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

Emily Treaster, Assistant United States Attorney
Email: emily.treaster@usdoj.gov

Andrea Surrat, Assistant United States Attorney
Email: andrea.surrat@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Mark Uribes (via U.S. Mail)

*s/ Mary V. Butterton*
MARY V. BUTTERTON
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
Mary_Butterton@fd.org
Attorney for Defendant